# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**MAX FIFIELD**
        **Plaintiff,**

    **v.**                                     **Case No. 17-C-81**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the Social Security Administration**
                **Defendant.**

---

## DECISION AND ORDER

Plaintiff Max Fifield applied for social security disability benefits, alleging that he could no longer work due to groin and shoulder impairments, but the Administrative Law Judge ("ALJ") assigned to the case concluded that these impairments did not prevent plaintiff from performing his past relevant work as an area manager in a store. Plaintiff now seeks judicial review of the ALJ's decision.

The reviewing court asks whether the ALJ's decision is supported by "substantial evidence," meaning such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Stepp v. Colvin, 795 F.3d 711, 718 (7th Cir. 2015). The court's task is, under this standard, extremely limited. Id. The court may not displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations. Id. Even if reasonable minds could differ concerning whether the claimant is disabled, the court must nevertheless affirm the ALJ's decision denying the claim if the decision is adequately supported. Id. While the ALJ must consider the entire record, not just the evidence supporting his conclusion, he need only "minimally articulate" his justification for rejecting or accepting

specific evidence of disability, a standard the Seventh Circuit has characterized as "lax." Berger v. Astrue, 516 F.3d 539, 545 (7th Cir. 2008).

Under these standards, plaintiff's action fails.  Plaintiff first argues that the ALJ gave too much weight to a treatment note suggesting that he avoided activity so as not to interfere with his disability claim.  While I may not have construed the note the same way, weighing the evidence is a task for the ALJ, not the reviewing court.  Second, plaintiff argues that the ALJ used the wrong job description from the Dictionary of Occupational Titles ("DOT") in determining that he could return to past work.  However, the ALJ relied on the testimony of a vocational expert, which plaintiff did not contest at the hearing, in making this finding; plaintiff accordingly forfeited the argument he now raises.  Third,  plaintiff argues that the ALJ erred in discounting the report of his treating physician, but the ALJ provided valid reasons for this conclusion, supported by the evidence.  Finally, plaintiff argues that the ALJ improperly evaluated the credibility of his statements regarding pain and other limitations.  On review of the record, however, I cannot conclude that the ALJ's finding was patently wrong.  I accordingly affirm the ALJ's decision and dismiss this action.

## I.  FACTS AND BACKGROUND

### A.    Medical Evidence

Although plaintiff alleged a disability onset date of June 5, 2012, his pertinent medical history begins in September 2010, when he underwent laser vaporization of the prostate to treat symptoms of BPH with urinary retention.[1]  (Tr. at 335.)  Thereafter, he developed intestinal and irritable bowel symptoms, which Dr. James Radke, a gastroenterologist, treated with fiber

---

[1]Benign prostatic hyperplasia ("BPH") is a common, noncancerous enlargement of the prostate gland.  https://www.medicinenet.com/script/main/art.asp?articlekey=8946.

and Bentyl.[2]  On January 3, 2011, plaintiff advised Dr. Radke that he had made some improvement but not complete, and he had been taking narcotics for pain.  Dr. Radke switched plaintiff from Bentyl to Librax[3] and asked him to stay away from narcotics as much as possible. (Tr. at 401.)

On January 7, 2011, plaintiff saw Dr. Martin Baur, his primary physician, complaining of chronic abdominal pain.  (Tr. at 367.)  Dr. Baur assessed irritable bowel syndrome likely complicated by prostatitis and the prostate surgery he had.  Plaintiff did seem to be gradually improving with decreased Percocet use; he was to continue using Percocet as needed and follow up with gastroenterology and urology.  (Tr. at 368.)

On February 10, 2011, plaintiff saw Dr. Steven Bernstein, a urologist, reporting fairly constant lower abdominal discomfort.  (Tr. at 395.)  Dr. Bernstein assessed probable bilateral inguinal hernias, referring him to surgery.  (Tr. at 396.)  On February 18, 2011, Dr. Lief Erickson performed hernia repair surgery.  (Tr. at 388-389.)  Plaintiff initially seemed to recover well from the surgery, being released to return to work on March 19 with no restrictions.  (Tr. at 388.) Later in March, however, he developed areas of redness and drainage in his hernia surgery incisions, for which he was given antibiotics.  (Tr. at 384-87.)  By April 6, the incisions were markedly improved, and plaintiff stated that he felt a lot better. (Tr. at 383.)

Later in April 2011, plaintiff developed appendicitis, for which he underwent an appendectomy.  On May 4, he returned for a post-operative check, reporting some mild

---

[2]Bentyl (Dicyclomine) is used to treat irritable bowel syndrome ("IBS"). https://www.webmd.com/drugs/2/drug-5245/bentyl-oral/details.

[3]Librax is a medicine that may be effective in treating stomach ulcers, IBS, or symptoms related to intestinal infection.  https://www.drugs.com/librax.html.

discomfort, especially with walking or movement. His incisions were healing well. He was provided more Percocet for pain control and given a return to work slip for May 14 with no restrictions. (Tr. at 382.)

In June 2011, plaintiff injured his groin at work pulling a skid containing water bottles. (Tr. at 267.) On June 27, he went to the emergency room, with doctors providing antibiotics and Oxycodone. (Tr. at 351, 355, 440-43.) On June 30, plaintiff followed up with Dr. Baur, reporting pain in the left groin area radiating across to the right side of the groin and the left side of his lower back, for which he took Percocet every four hours. (Tr. at 351.) On exam, he had some mild soreness in getting up out of the chair, but his gait was normal. Dr. Baur assessed left groin pain and left lower quadrant pain, possibly related to epididymitis[4] or irritation of scar tissue from his previous surgeries. (Tr. at 352.) He was to continue with the antibiotics provided in the ER and take Percocet for pain. (Tr. at 353.)

On July 15, 2011, plaintiff saw Dr. Radke, the gastroenterologist, at the request for Dr. Baur for review of an abnormal ultrasound. (Tr. at 398, 444.) Dr. Rake suspected the abnormality to be non-pathologic, and that the left groin pain was not gastrointestinal but possibly a recurrent hernia. (Tr. at 399.)

On August 27, 2011, plaintiff again went to the emergency room complaining of scrotal pain. He reported feeling a "tear" the previous day. (Tr. at 450.) A CT scan showed no evidence of recurrent inguinal hernia. (Tr. at 421.) He was discharged home on the same medications. (Tr. at 453.)

On August 29, 2011, plaintiff returned to Dr. Erickson for recheck, reporting constant

---

[4]Epididymitis is an inflammation of the coiled tube (epididymis) at the back of the testicle. https://www.mayoclinic.org/diseases-conditions/epididymitis/symptoms-causes/syc-20363853.

groin pain for the past six to eight weeks, similar to the pain he experienced prior to his hernia repair. The pain persisted and had not responded to conservative measures; he had been taking Percocet on a daily basis. On exam, Dr. Erickson found no indication of hernia; plaintiff did have mild left groin tenderness and very minimal tenderness on the right. (Tr. at 378.) Dr. Erickson suspected plaintiff may have strained something in the groin area, either the healing wound or possibly the superior portion of the adductor tendon. Since he had not responded to anti-inflammatories, Dr. Erickson recommended a Medrol Dosepak.[5] (Tr. at 379.)

On September 8, 2011, plaintiff followed up with Dr. Erickson, reporting no improvement on Medrol Dosepak. He continued to complain of aching pain in the groin, left more than right, increased by activity. Dr. Erickson was not sure what was causing his pain and discomfort. They discussed alternatives, including injections, which plaintiff declined. Dr. Erickson started a therapeutic trial of Neurontin.[6] (Tr. at 377.)

On September 13, 2011, plaintiff saw Dr. Bernstein, the urologist, at the request of Dr. Erickson for evaluation of incomplete bladder emptying. Plaintiff reported that his groin pain was better but stated his urine stream had been weaker. (Tr. at 393.) Dr. Bernstein ordered various tests to check kidney function. (Tr. at 394.)

On September 19, 2011, plaintiff followed up with Dr. Erickson, improving slowly. He felt enough better to return to work and arrangements were made for him to do that. (Tr. at 376.) Notes from the fall of 2011 indicate that plaintiff continued to receive Percocet for lower

---

[5]Medrol Dosepak is a steroid that prevents the release of substances in the body that cause inflammation. https://www.drugs.com/mtm/medrol-dosepak.html.

[6]Neurontin (gabapentin) is an anti-epileptic drug used to treat neuropathic (nerve) pain. https://www.drugs.com/neurontin.html.

abdominal pain.  (Tr. at 339-42, 345-46, 349.)

On October 31, 2011, plaintiff saw Dr. Frederick Kron for persistent left lower quadrant pain, treated with gabapentin and steroids, which were not entirely effective.  He was vague about anything that made his pain better other than Percocet.  (Tr. at 335.)  Dr. Kron continued Percocet and discontinued Neurontin.  Plaintiff was also directed to follow up with urology and surgery.  (Tr. at 336.)

Plaintiff subsequently saw Dr. William Deshur, a general surgeon, for a second opinion. Dr. Deshur did not feel plaintiff was a surgical candidate and referred him to a pain clinic for evaluation.  On December 20, 2011, plaintiff saw Dr. John Bruskey at Innovative Pain Care, for evaluation of his ongoing left groin pain.  At that time, he continued working full time as a supervisor at Walmart.  (Tr. at 416.)  On exam, he had tenderness over the left side of the groin without any masses or abnormalities.  Dr. Bruskey assessed chronic left groin pain following hernia surgery, which could be related to the sutures, a neuroma, or possibly entrapment of the ilioinguinal nerve.  (Tr. at 417.)  He did not recommend injections, since plaintiff was afraid of needles, but suggested a trial of Lyrica.[7]  They would consider an injection if the Lyrica did not work.  (Tr. at 418.)

On January 17, 2012, plaintiff returned to Dr. Bruskey, reporting no improvement with Lyrica, so Dr. Bruskey doubled the dose.  (Tr. at 414-15.)  On January 31, Dr. Bruskey administered a trigger point injection.  (Tr. at 412-13.)  On February 28, plaintiff reported no significant improvement from the injection; he also got no benefit from Lyrica.  He did get some temporary pain relief from using Percocet.  He was supposed to limit himself to four pills per

---

[7]Lyrica is used to treat nerve pain.  https://www.drugs.com/lyrica.html.

6

day but was using six.  Dr. Bruskey recommended medication changes, switching him from Percocet to Oxycodone, and from Lyrica to gabapentin.  (Tr. at 410.)  They would consider a nerve block injection if he did not respond to the medication.  (Tr. at 411.)

Plaintiff returned to Dr. Bruskey on March 27, 2012, reporting no pelvic pain.  However, he had developed numbness and pain in the left foot.  (Tr. at 408.)  On exam, he was able to rise from a seated position without assistance but displayed poor balance and some weakness with toe and heel standing.  Dr. Bruskey recommended a lumbar MRI and continued the same medications for improved pelvic pain.  (Tr. at 409.)  An April 10 MRI showed non-specific straightening of the lumbar lordosis with degenerative disc disease but nothing that would explain the left leg symptoms.  (Tr. at 406, 419-20.)  When plaintiff returned to Dr. Bruskey on April 17, he did not complain of the left leg symptoms but reported pain in the left side of the groin.  (Tr. at 406.)  Dr. Bruskey recommended another injection (Tr. at 407), which he administered on April 24 (Tr. at 404-05).

On April 26, 2012, plaintiff went to the emergency room complaining of groin and abdominal pain.  (Tr. at 456.)  He was given Zofran[8] and Dilaudid[9] and discharged home to follow up with Dr. Baur.  (Tr. at 457-58.)

On May 1, 2012, plaintiff saw Dr. Baur, indicating that he took two to three Oxycodone tablets in the morning to be able to function at work, which required him to be on his feet 9 hours per day.  He reported that it hurt him to walk, so he had to walk slowly.  He reported no

---

[8]Zofran (ondansetron) blocks the actions of chemicals in the body that can trigger nausea and vomiting.  It is used to prevent nausea and vomiting that may be caused by surgery, cancer chemotherapy, or radiation treatment.  https://www.drugs.com/zofran.html.

[9]Dilaudid (hydromorphone) is an opioid pain medication used to treat moderate to severe pain.  https://www.drugs.com/dilaudid.html.

side effects of the medication, but the pain was impacting his quality of life, both at home and work. (Tr. at 328.) On exam, he moved pretty well overall with no antalgic gait. He had pain on palpation of the inguinal area on the left. Dr. Baur suggested another consult with a general surgeon; he was to follow up with the pain clinic for his medications for now but expressed a desire to transition that to Dr. Baur. (Tr. at 329.)

On May 15, 2012, plaintiff told Dr. Baur that he had been taking more Oxycodone than prescribed. (Tr. at 324.) Dr. Baur assessed chronic pain, sub-optimal control, in an opioid tolerant patient. He had failed in multiple rounds of injections at the pain clinic and was establishing with Dr. Baur for continued medication management in addition to his primary care to try to keep everything in one place. They discussed using long-acting OxyContin with Oxycodone as needed. (Tr. at 325.) However, plaintiff's insurance did not cover OxyContin, so they tried a higher dose of Oxycodone. He was also continued on gabapentin. (Tr. at 325-26.)

On June 5, 2012, plaintiff returned to Dr. Baur, noting that the medications reduced the pain, as did decreasing his activity level. (Tr. at 320.) On exam, he showed some antalgic movement getting up out of a chair, but once he was up and ambulating did much better. Dr. Baur recommended taking some time off work to try to reset. Plaintiff was also advised to see Advanced Pain Management for further injections. (Tr. at 321.)

On June 11, 2012, plaintiff saw Dr. Kostandinos Tsoulfas at Advanced Pain Management. Dr. Tsoulfas diagnosed disorder/male genitalia and neuralgia/neuritis, providing a left-sided pudendal nerve block. (Tr. 426-29.)

On June 19, 2012, plaintiff returned to Dr. Baur, indicating that he felt better when he was less active. He also admitted that he had taken more medication than prescribed and

consequently ran out of pills on June 13, 2012. He reported receiving an injection at the pain clinic, which did not relieve his pain. He further reported that when he took more of the medication he was able to function better and was not a prisoner at home. (Tr. at 316.) He did report a rough couple days, where all he could do was lie in bed. (Tr. at 316-17.) Based on the absence of surgical options, plaintiff had elected to proceed with additional injections and medication management. Pain control had overall been sub-optimal, but he had been self-adjusting his narcotic doses. He was given a one-week supply and instructed to return at that time for possible adjustments. (Tr. at 317.)

On June 25, 2012, plaintiff returned to Dr. Tsoulfas for a caudal epidural steroid injection. (Tr. at 431.) On June 26, he saw Dr. Baur, seen in close follow up as he had been self-adjusting his narcotic dosage despite recommendations not to do so. He reported that the injection done the previous day provided no relief. Oxycodone helped for two to three hours, but overall he was not able to do much of anything because of pain. Gabapentin did ease some of the sharp, jabbing pain. (Tr. at 313.) On exam, he showed discomfort when getting up from a seated position, but when he got moving did not show any antalgic gait. Dr. Baur increased his Oxycodone to see if he could become more active at home and perhaps get enough pain relief to return to work. (Tr. at 314.)

On July 3, 2012, plaintiff returned to Dr. Baur, stating that his pain medications controlled his pain satisfactorily if he did not do anything; with activity, he had pain. (Tr. at 309.) On exam, gait and tone were normal. He had discomfort when getting up from a seated position but ambulated pretty well. Dr. Baur assessed chronic inguinodynia, with sub-optimal pain control. (Tr. at 310.)

On July 9, 2012, plaintiff saw Jill Pocius, NP, at Advanced Pain Management, reporting

that the pain was unchanged since his last visit. (Tr. at 433.) NP Pocius recommended a spinal cord stimulator, providing information about this option. (Tr. at 434.)

On July 17, 2012, plaintiff returned to Dr. Baur, reporting that he took pain pills every four hours, with one to two hours of relief before the medication wore off. During this time of pain relief, he could get his activities of daily living done but afterwards he would have a lot more pain. The injections did not help. Dr. Baur concluded that plaintiff had limited options; medication management seemed to be the only viable one. He reported no side effects from the medication. (Tr. at 306.) Dr. Baur increased the frequency of the medication, noting: "He has still been a prisoner to the pain. . . . I am not optimistic he will be able to return to work as I do not see him getting off of the narcotics." (Tr. at 307.)

On July 24, 2012, plaintiff returned to Dr. Baur, taking immediate release Oxycodone every three to four hours, which helped considerably. He was able to do more during the day in terms of activities of daily living and routine housework, but he still could not do prolonged activities. (Tr. at 539.) On exam, he had significant pain on palpation of the left groin, exhibited soreness in getting up out of the chair, and limped, although his gait normalized as he walked. Dr. Baur suggested they switch to a longer-acting medication, such as MS-Contin, but plaintiff was reluctant to use morphine products. (Tr. at 540.) Dr. Baur again indicated that he did not think plaintiff would be able to return to work. (Tr. at 541.)

On July 31, 2012, plaintiff went to the ER with chest pain and shortness of breath. (Tr. at 459.) He indicated that he was out in the heat pushing a lawn mower and then rushed to a doctor's appointment, when he found he was sweating profusely and having left-side chest pain. (Tr. at 470, 501.) His pain spontaneously improved somewhat, improving further with nitroglycerin. (Tr. at 465.) Testing revealed no cardiac abnormalities. (Tr. at 466-72.)

On August 16, 2012, plaintiff followed up with Dr. Baur regarding his chest pain; he reported no recurrence of chest pain and felt fine. (Tr. at 536.) He continued to experience left groin pain, however, which caused him to spend most of his time in bed. (Tr. at 536.) They again discussed switching from Oxycodone to long acting medications. (Tr. at 537.)

On August 30, 2012, plaintiff returned to Dr. Baur, who noted the difficulty they had in finding an effective medication regimen. He had "often been a prisoner to his pain." (Tr. at 533.) He had run out of gabapentin and noticed an increase in sharp stabbing pain. He now wanted to explore use of extended use morphine. (Tr. at 533.) Dr. Baur assessed chronic left inguinodynia, with failed procedural interventions. He had been functionally disabled because of the pain and "not likely to be able to return to work." (Tr. at 534.) Dr. Baur agreed to switch plaintiff from Oxycodine to MS-Contin and immediate release morphine for breakthrough pain. (Tr. at 534.)

On September 5, 2012, plaintiff told Dr. Baur that the morphine worked for about two hours, during which time he could do some activities of daily living, but then had to return to bed. (Tr. at 530-31.) On exam, the left groin area was hyper-sensitive to even light touch, but he was able to get up from the chair pretty well and ambulated normally without evidence of significant antalgic gait. Dr. Baur increased the medication dosages. (Tr. at 531.)

On September 12, 2012, plaintiff reported that he continued to have a lot of pain, which prevented him from performing daily activities. (Tr. at 526.) On exam, Dr. Baur noted that plaintiff had a lesser amount of pain on palpation, stating: "He was not as dramatic today." (Tr. at 527.) He still had soreness in getting up from the chair but overall seemed a little better clinically than he had previously. He still ambulated well. (Tr. at 527.) Dr. Baur adjusted the MS-Contin dose and immediate release morphine regimen. He advised plaintiff to stick with

11

this regimen and to try to become more active.  (Tr. at 528.)

On September 19, 2012, plaintiff reported some improvement on the new regimen,  with more good days than bad the past week.  He had been able to get up and do more chores and activities; he was also sleeping better.  (Tr. at 523.)  On exam, the left groin was still sore on palpation but not as bad as prior visits.  Dr. Baur assessed chronic left inguinodynia, with improving pain control.  Dr. Baur refilled gabapentin and morphine products.  (Tr. at 524.)

On October 4, 2012, plaintiff reported that "things are going better."  (Tr. at 520.)  The current medications helped him "to be able to function better and do activities of daily living. He was actually even able to fix a broken stair at home."  (Tr. at 521.)  He felt a pulling sensation the next day, but that had gotten better.  "Standing and being active will cause modest pain, but currently he is doing better.  Overall, he is satisfied with his pain control."  (Tr. at 521.)  On exam, he had some soreness on palpation of the left groin but not as bad as prior office visits.  He exhibited some soreness in getting up from the chair, but his ambulation was also getting better and less antalgic.  His displayed normal muscular tone.  Dr. Baur assessed chronic left inguinodynia, with improving pain control.  They continued on the same medication regimen.  (Tr. at 521.)

On October 16, 2012, plaintiff returned to Advanced Pain Management, noting that his pain had not changed since the last visit.  (Tr. at 642.)  NP Pocius and Dr. Tsoulfas recommended a "neurostimulator."  (Tr. at 643.)

On October 23, 2012, plaintiff told Dr. Baur he was considering a trial with the spinal cord stimulator.  He reported that things were about the same overall.  (Tr. at 517.)  The medications helped him to be able to do some activities of daily living, although he still had pain with moving the left leg.  He had been unable to return to work due to the chronic narcotics and

12

the severity of his pain. (Tr. at 518.) On exam, he still had pain to palpation at the left groin but walked pretty well overall. Dr. Baur assessed chronic left inguinodynia, with satisfactory pain control overall, continuing his current medications. (Tr. at 518.) Given his compliance with medications, which had been an issue in the past, they discussed increasing the interval between office visits. (Tr. at 519.)

On November 12, 2012, plaintiff reported a little more pain than at his last visit, and that it tended to be worse as he moved around or sat or stood for a long period of time. His daughter helped him with some routine activities of daily living. (Tr. at 514.) Gabapentin had eliminated the sharp shooting pains, and morphine also seemed to help. He was still considering the spinal cord stimulator. On exam, his left groin was still quite tender to palpation. (Tr. at 515.) Dr. Baur assessed chronic left inguinodynia, with recent compliance with medications and satisfactory pain control overall. (Tr. at 515-16.) Dr. Baur continued plaintiff on MS-Contin and morphine. Given his recent compliance, he was given a month's supply. (Tr. at 516.)

On December 10, 2012, plaintiff indicated that he still felt a chronic pulling sensation and pressure in the left groin, but it had not changed at all. Gabapentin helped eliminate sharp, shooting pains. He reported satisfactory pain control overall, though some days were rougher than others. He stated that a couple times a week he had more pain and backed down his activities. He reported no side effects from the narcotics. (Tr. at 511.) On exam, Dr. Baur noted that plaintiff "moves pretty well today. Less evidence for pain with getting up from a seated position. He ambulates normally." (Tr. at 512.) Dr. Baur assessed chronic left inguinodynia, with "satisfactory pain control overall." (Tr. at 512.) Dr. Baur continued current medications, as plaintiff was "satisfied with pain control." (Tr. at 512.) If his pain relief

continued to be stable and his medication use pattern was appropriate, they would start extending office visits to every two months. (Tr. at 512.)

On January 8, 2013, plaintiff told Dr. Baur that he had elected not to pursue the spinal cord stimulator. He stated that he constantly felt a pulling sensation in the left groin, but it was not changing. Gabapentin eliminated the sharp, electric, shooting pains. Some days were worse than others, but overall his pain was satisfactory. He noted no side effects from his medications. (Tr. at 508.) On exam, he still had pain to palpation of the left groin area, but gait was normal. Dr. Baur assessed chronic left inguinodynia, noting: "Reasonable pain control overall." (Tr. at 509.) Dr. Baur continued plaintiff on his current dose of MS-Contin, scheduling follow up in a month; if his pain control remained stable, they would start extending the interval between office visits even further. (Tr. at 509.)

On February 6, 2013, plaintiff again told Dr. Baur that he felt a chronic pulling sensation in the left groin, but it was not changing. Some days were worse than others, but overall his pain control was satisfactory. He had been able to shovel snow, although it caused some pain in the right groin. (Tr. at 554.) On exam, his gait was normal as he got moving. He had pain on palpation of the groin. Overall his condition was stable, with some days better than others. However, Dr. Baur noted that plaintiff was unable to return to work since his symptoms limited most activities; he should avoid lifting more than 10 pounds or standing/sitting more than 30 minutes. (Tr. at 556.)

On February 23, 2013, plaintiff went to the emergency room complaining of right shoulder pain. An MRI revealed a near full thickness tear of the rotator tendon, and a cervical MRI revealed a moderate disc bulge at C6-7. (Tr. at 559-60.) Doctors increased his pain medication dosage and instructed him to follow up with Dr. Baur. (Tr. at 562-64.) On February

14

26, Dr. Daniel Ladwig provided a cortisone injection to the shoulder.  (Tr. at 674.)

On March 5, 2013, plaintiff followed up with Dr. Baur following his hospitalization.  He continued to have baseline pain of 4/10 in the shoulder.  His groin pain was actually better controlled on the new medication dose.  (Tr. at 550.)  Dr. Baur recommended that plaintiff follow up with orthopedics to explore surgical intervention and to try to get into physical therapy. Dr. Baur also expressed discomfort in continuing to prescribe narcotics at the new, higher dose, suggesting another pain clinic consultation.  Plaintiff wanted to proceed with a surgical intervention, then hopefully revert to his prior pain medication dosing.  (Tr. at 553.)

On March 12, 2013, plaintiff followed up with Dr. Ladwig, noting benefit from the injection.  On exam, he had some impingement but better range of motion and less pain.  He was to start physical therapy and return in one month for re-evaluation.  (Tr. at 591.)

On March 19, 2013, plaintiff saw Dr. Baur, noting he had started therapy, but it was not helping.  (Tr. at 586-87.)  Regarding his inguinodynia, he noted some days were worse than others but overall his pain control was satisfactory.  (Tr. at 588.)  He was continued on his current medication regimen.  (Tr. at 590.)

On April 9, 2013, plaintiff returned to Dr. Ladwig, who recommended surgery.  (Tr. at 586.)  On April 25, Dr. Baur performed a pre-operative exam,[10] with Dr. Ladwig performing the

---

[10]On April 27, 2013, Dr. Baur completed a questionnaire, listing a diagnosis of chronic inguinodynia, with symptoms of severe pain requiring high dose narcotics and positive objective signs of impaired sleep and tenderness.  (Tr. at 810.)  He indicated that the pain would often interfere with attention and concentration, and that plaintiff had extreme limitation in his ability to deal with the normal stresses of employment.  (Tr. at 811.)  Br. Baur opined that plaintiff could continuously sit for one hour and stand for 30 minutes; in an eight-hour day, he could stand/walk less than two hours and sit about four hours.  He also needed to include periods of lying down during an eight-hour workday due to pain and fatigue, and needed a job that permitted shifting positions at will.  (Tr. at 812.)  He could frequently lift less than 10 pounds, occasionally 20 pounds, never 50 pounds.  Due to his rotator cuff tear, he could not reach

rotator cuff repair procedure on May 2, 2013. (Tr. at 576, 683-85.) Plaintiff experienced some post-operative issues with the sutures (Tr. at 574-75), but on June 10, 2013, he told Dr. Baur, "Overall things are going well" (Tr. at 570), and on June 19, 2013, he was noted to be making good progress in physical therapy (Tr. at 569). He participated in therapy for several months thereafter. (Tr. at 686-734.)

In June 2013, plaintiff switched his primary care to the Veterans Administration ("VA") based on a loss of private insurance. (Tr. at 815, 823-25.) The VA subsequently took over his medication management. (Tr. at 827, 833-35.)

On April 24, 2014, plaintiff underwent a functional capacity evaluation ("FCE"), which lasted two hours. The results indicated that he should be able to work at the light level for a four-hour day. He should not stand for more than 15 minutes at a time or sit for more than 30-60 minutes at a time. He should not lift more than 20 pounds occasionally and never perform tasks that require balancing. He was also aerobically unfit and should not over-exert himself, which could quickly raise his heart level to an unsafe level. The evaluators concluded that plaintiff gave a good effort. (Tr. at 626.)

During a June 3, 2014, contact with the VA, plaintiff indicated he was out of morphine and needed to pick it up. He had not escalated his dose but was stiffer in the morning and wondered about more. The provider stated: "I suggested increased activity/exercise. His SSI hearing is coming up soon, so he does not want to do any activities that will interfere." (Tr. at 838.)

On June 10, 2014, plaintiff saw Dr. Baur, reporting that his pain control was satisfactory.

---

overhead with his right arm. Finally, he would likely be absent more than three times per month due to his impairments. (Tr. at 813.)

(Tr. at 789.) Dr. Baur indicated that he felt plaintiff had "complex regional pain syndrome." (Tr. at 789.) Dr. Baur further indicated that he had reviewed the recent FCE and agreed that the result seemed reasonable and consistent with the clinical picture. (Tr. at 790.)

On November 30, 2014, plaintiff told Dr. Baur that overall things were going well, although he continued to complain of chronic pain that limited his activities. (Tr. at 793.) Dr. Baur deferred treatment to the VA provider. (Tr. at 796.) On December 27, plaintiff saw Dr. Baur for follow up of his chronic obstructive pulmonary disease ("COPD"), doing well in that regard. (Tr. at 797-98.) On March 12, 2015, plaintiff advised Dr. Baur things were unchanged. He continued to receive pain medications through the VA. (Tr. at 799-800.)

On March 9, 2015, plaintiff underwent a vocational evaluation on referral from his DVR (Division of Vocational Rehabilitation) counselor. (Tr. at 267.) The evaluators received no medical records, but based on plaintiff's self-reported limitations (lifting no more than 15 pounds, standing no longer than 15 minutes, sitting 45-60 minutes, alternating sitting and standing as needed, and avoiding frequent bending and crawling), his work history, and academic testing, recommended that plaintiff pursue social security disability benefits. (Tr. at 268-77.) The report concluded that plaintiff did not have the skills for employment within his numerous restrictions, and that it was also uncertain if he could work full time. (Tr. at 277.)

On April 10, 2015, plaintiff went to the emergency room complaining of right shoulder pain. X-rays revealed nothing acute. He was given Dilaudid and Valium but continued to have pain and so was admitted for further observation and evaluation (Tr. at 665), receiving intravenous Toradol (Tr. at 667).

On May 5, 2015, plaintiff returned to Dr. Baur complaining of right arm and elbow pain. The pain had lingered for several weeks despite his use of narcotics, MS-Contin and morphine.

17

(Tr. at 806.)  Dr. Baur ordered an MRI of the C-spine.  (Tr. at 808.)  A May 26, 2015, note from the VA indicated chronic pain, "controlled on current pain regimen."  (Tr. at 836.)

## B.    Procedural History

### 1.    Plaintiff's Application and Supporting Materials

Plaintiff applied for benefits in December 2012, alleging a disability onset date of December 8, 2012.[11]  (Tr. at 181.)  In a function report, plaintiff indicated that he was unable to lift, pull, or push more than 10 pounds, or walk, stand, or sit for more than 30 minutes.  (Tr. at 214, 219.)  He indicated that he used gabapentin and two different types of morphine for pain control.  (Tr. at 266.)  He reported past employment as a zone manager at a retail store from 2006 to 2012, which required him to be on his feet most of the day and lift up to 50 pounds; as a plate mounter at a printing company from 2004 to 2006, which also required standing for most of the day and lifting up to 50 pounds; and as a roofer from 1999 to 2004, which required lifting up to 60 pounds.  (Tr. at 223-26, 260.)

The agency denied the application initially on April 11, 2013, relying on the opinion of reviewing consultant George Walcott, M.D., who concluded that plaintiff could perform sedentary work.  (Tr. at 77-78, 84, 87-88, 121.)  Plaintiff requested reconsideration (Tr. at 130), but on September 9, 2013, the agency maintained the denial, relying on the opinion of Lynne Torello, M.D., who agreed with Dr. Walcott (Tr. at 113-15, 131).  On October 10, 2013, plaintiff requested a hearing before an ALJ.  (Tr. at 137.)

### 2.    Hearing

On July 14, 2015, plaintiff appeared with counsel for his hearing before the ALJ.  The

---

[11]At his hearing before the ALJ, he amended the onset date to June 5, 2012.  (Tr. at 33-34.)

ALJ also summoned a vocational expert ("VE").  (Tr. at 28.)

### a.    Plaintiff

Plaintiff testified that he was 51 years old, 5'4" tall and 140 pounds (up about 15 to 20 pounds over the past three years due to decreased activity).  (Tr. at 36-37.)  He indicated that he was divorced, with three adult children.  He lived with two of his children, his brother, and one roommate.  He reported no income other than food stamps.  (Tr. at 37.)

Plaintiff testified that he had a driver's licence but did not drive as often as he used to, maybe once or twice per week.  He did not finish high school but obtained a GED.  He had no further technical or vocational training.  (Tr. at 38.)

Plaintiff testified that he last worked on June 5, 2012.  He indicated that he could no longer work because of his groin injury, which caused pain and impeded his ability to stand and walk.  (Tr. at 39.)  He rated that pain at between 4 and 6 on a 1-10 scale, greater with activity.  (Tr. at 41.)  He further indicated that he had rotator cuff surgery on his right shoulder, which never really came back 100% (Tr. at 39); he indicated that he had trouble reaching overheard and could not lift more than 10 pounds (Tr. at 40-41).

Plaintiff testified that he took two different kinds of morphine, which reduced the pain in his groin after about 30 to 45 minutes.  (Tr. at 42.)  The relief last for about two hours, before the pain increased again.  The morphine caused dizziness and drowsiness.  He also took gabapentin, which stopped the sharp pains he had been experiencing in his groin.  (Tr. at 43.)  He no longer received injections for his groin.  (Tr. at 44.)  There was a discussion of a spinal cord stimulator, but he decided not to do that.  (Tr. at 57-58.)

Plaintiff testified that on a typical day he would wake up in pain, take his medication, then lay down for 30 to 45 minutes waiting for the medication to kick in.  He would then have

breakfast and go on the computer for awhile or help his brother with chores. He would not lift anything heavy but could use a leaf blower to clean off the deck. (Tr. at 45.) He would then have lunch, take another round of medication, and sometimes fall asleep. He would try to do some more chores, like feed the cat, empty the dishwasher, or do some light grocery shopping. He would then watch TV until bed time. (Tr. at 46.) Plaintiff testified he was able to do his own laundry but needed help bringing it downstairs; he was also able to prepare simple meals, use a vacuum, sweep, and mop. (Tr. at 46-47.) Plaintiff estimated that he could lift 10 pounds with his right arm, 15 pounds using both arms. (Tr. at 49.) He indicated that he could sit for about an hour, stand for 15-30 minutes (Tr. at 53-54), and walk 200 to 300 feet before the pain developed (Tr. at 48).

The ALJ asked plaintiff about the June 2014 note in the VA records, in which the provider suggested plaintiff increased his activity and exercise, with plaintiff responding that he did not want to do any activities that would interfere with his SSI hearing. Plaintiff testified that he did not recall this conversation. (Tr. at 48.)

### b. VE

The VE identified five job titles in plaintiff's work history: plate mounter (DOT # 659.684-010), medium as generally performed and as plaintiff did it; roofer (DOT # 866.381-010), medium generally, heavy as plaintiff did it; overnight stocker (DOT # 299.367-014), heavy generally and as performed; department manager (DOT # 299.127-010), medium as generally and actually done; and area manager (DOT # 183.117-010), sedentary generally, medium as performed.[12] (Tr. at 63-64.) The ALJ then asked a hypothetical question, assuming a person

---

[12]Through follow-up questioning, the ALJ established that plaintiff worked as a manager at Walmart for a total of six years, as a department manager for about four years and an area

20

of plaintiff's age, education, and work experience, limited to sedentary work. (Tr. at 64-65.) The VE testified that such a person could do the area manager job, as generally performed. (Tr. at 65.) Adding a limitation of only occasionally reaching forward and never reaching overhead with the dominant arm, the person could still do the area manager job, as generally performed. (Tr. at 66-67.)

### 3. ALJ's Decision

On July 16, 2015, the ALJ issued an unfavorable decision. (Tr. at 8.) Following the familiar sequential evaluation process,[13] the ALJ determined at step one that plaintiff had not engaged in substantial gainful activity since June 5, 2012, the alleged onset date; at step two that he suffered from the severe impairments of chronic left inguinodynia (groin pain) and status-post right shoulder rotator cuff repair;[14] and at step three that none of these impairments qualified as presumptively disabling under the agency's regulations. (Tr. at 13-14.) Prior to reaching step four, the ALJ determined that plaintiff retained the RFC to perform sedentary work, with occasional reaching forward and no overhead reaching with his right arm. In making

_____

manager for about two years. (Tr. at 69-70.) The VE testified that a total of six years as a manager would allow plaintiff to satisfy the SVP (specific vocational preparation) requirement for the area manager job. (Tr. at 73.)

[13]Under this test, the ALJ determines: (1) whether the claimant is doing substantial gainful activity; (2) if not, whether the claimant has a severe, medically determinable physical or mental impairment; (3) if so, whether the claimant's impairment meets or equals one of the presumptively disabling conditions listed in the regulations; (4) if not, whether the claimant can, based on his residual functional capacity ("RFC"), still do his past relevant work, either as he actually performed it or as it is generally performed in the economy; and (5), if not, whether he can, given his RFC, age, education, and work experience, make an adjustment to other work. 20 C.F.R. § 404.1520(a)(4).

[14]The ALJ acknowledged that, in addition to these impairments, plaintiff had a history of degenerative disc disease and COPD. However, the ALJ found these other conditions non-severe. (Tr. at 14.) Plaintiff does not challenge this finding.

21

this determination, the ALJ considered plaintiff's statements regarding his symptoms and the medical opinion evidence.  (Tr. at 15.)

The ALJ acknowledged the required two-step test for symptom evaluation, under which he had to first determine whether plaintiff suffered from an impairment that could reasonably be expected to produce his pain or other symptoms.  Second, once such an impairment had been established, the ALJ had to determine the extent to which the symptoms limited plaintiff's functioning based on a consideration of the entire case record.  (Tr. at 15, citing SSR 96-7p.)[15]

The ALJ began by summarizing plaintiff's claims.  At the hearing, plaintiff testified that he was unable to work due to severe pain in his groin, which limited his ability to stand and walk, and because of his right shoulder, which never came back 100% after surgery and prevented him from lifting his right arm all the way up or lifting more than 10 pounds.  Plaintiff testified that he took morphine (which caused dizziness or drowsiness) and gabapentin for pain relief.  In terms of his daily activities, plaintiff indicated that he could help his brother perform work outside, such as using a leaf blower to clean the deck.  He was also able to do chores such as loading the dishwasher, purchasing light groceries, preparing simple meals, helping with the laundry, vacuuming or sweeping, and doing some yard work.  He testified that he napped in the afternoon, after taking morphine, and had trouble sleeping at night.  (Tr. at 15.)

---

[15]In 2016, the Commissioner issued an updated Ruling on symptom evaluation, which eliminates use of the term "credibility" and clarifies that "subjective symptom evaluation is not an examination of an individual's character."  SSR 16-3p, 2016 SSR LEXIS 4, at *1.  This "change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence."  Cole v. Colvin, 831 F.3d 411, 412 (7th Cir. 2016).  The new Ruling uses the same two-step test and directs consideration of the same seven factors as SSR 96-7p.  SSR 16-3p, 2016 SSR LEXIS 4, at *18-19; SSR 96-7p, 1996 SSR LEXIS 4, at *8.

He estimated that he could lift up to 10 pounds in his right hand and up to 15 pounds in both hands together; could walk only 200 to 300 feet without pain; sit for 60 to 90 minutes at a time; and stand for 15 to 30 minutes.  (Tr. at 15-16.)

The ALJ next reviewed the medical evidence, which confirmed that plaintiff had an unusual condition, chronic left inguinodynia, of long standing.  He presented at the emergency room with bilateral groin pain in June 2011, following a history of prostate surgery in September 2010 and double hernia repair in February 2011.  Additional issues with groin pain resulted in a second emergency room visit in August 2011, after which he began receiving treatment at Innovative Pain Care in December 2011, receiving injections in January and April 2012.  He received additional injections in June 2012 performed by Dr. Tsoulfas at Advanced Pain Management.  Plaintiff reported in July 2012 that his pain had not changed, and Dr. Tsoulfas recommended a trial spinal cord stimulator, although plaintiff later elected not to have this procedure done.  (Tr. at 16.)

Plaintiff continued to complain of left groin pain, for which he received pain medication from his primary physician, Dr. Baur.  On June 5, 2012, plaintiff complained that his overall pain control was sub-optimal; the medications decreased his pain but so did decreasing his activity level.  On July 17, 2012, plaintiff advised Dr. Baur that his medication gave him one to two hours of relief, during which time he could perform his daily activities, but afterwards he would have a lot more pain.  Dr. Baur noted plaintiff was tolerant to opioids and a "prisoner to the pain," and he was not optimistic plaintiff would be able to return to work.  In January 2013, plaintiff advised Dr. Baur that morphine helped ease his pain.  Dr. Baur further noted that they were increasing the interval between office visits, but that plaintiff also complained of an unchanged chronic pulling sensation in the left groin.  Gabapentin helped eliminate the sharp

23

electric shooting pains that he had been feeling, and Dr. Baur noted "reasonable pain control overall." (Tr. at 16.) By June 2013, Dr. Baur noted: "Overall things are going well," with "satisfactory" pain control. At that time, plaintiff lost his health insurance and so transferred his care to the VA health system. (Tr. at 16.)

In July 2013, plaintiff presented at the VA Medical Center to discuss medication management, with an infrequent series of visits thereafter. On June 3, 2014, plaintiff presented to pick up more morphine; he told the clinician he had not escalated his dose but was stiffer in the morning and wondered about more. The clinician suggested that plaintiff increase activity and exercise, but plaintiff stated that his SSI hearing was coming up soon, and he did "not want to do any activities that will interfere." (Tr. at 16.) Later, a May 26, 2015 note indicated that plaintiff's chronic pain was "controlled on current pain regimen." (Tr. at 17.)

During this time, plaintiff also continued to see Dr. Baur on occasion. On June 10, 2014, Dr. Baur noted that plaintiff's inguinodynia was clinically stable, but symptomatic, and that plaintiff had complex regional pain syndrome ("CRPS"). On November 30, 2014, plaintiff told Dr. Baur the pain significantly limited his daily activities and that some days the medication did not help. However, this appeared to represent a flare-up, as later notes did not document such a high degree of pain. He was again noted to be clinically stable in March 2015, and the notes contain no subsequent mention of CRPS. (Tr. at 17.)

The ALJ also reviewed the evidence relating to plaintiff's right shoulder impairment, which revealed that plaintiff was hospitalized in February 2013 with right shoulder pain. An MRI revealed a tear of the rotator cuff tendon, as well as diffuse tendinopathy, moderate joint effusion, and degenerative joint changes. While in the hospital, plaintiff received a steroid injection and on discharge was referred to an orthopedist. On May 2, 2013, Dr. Ladwig

24

performed rotator cuff repair surgery.  A follow up note from June 19, 2013, indicated that plaintiff was making good progress in physical therapy.  Subsequent records contained little mention of this impairment, although plaintiff did report a pain flare-up in May 2015, and the ALJ accepted that plaintiff continued to experience some functional limitations following the rotator cuff repair.  (Tr. at 17.)

The ALJ then stated:

> After careful consideration of the evidence, I find the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.  Specifically, the objective medical evidence of record, summarized above, shows, more often than not, that his severe impairments are under control from a pain management standpoint.  While he clearly as a long-term chronic groin pain issue, within 12 months of the alleged onset date, more progress notes show him to be doing well, or with stable pain, than not.  Similarly, his right shoulder impairment, which required surgery within a few months of the onset of that condition, also has not generated a significant amount of concern among his treating physicians in the more recent records.

(Tr. at 17-18.)

The ALJ acknowledged that a claimant's symptoms sometimes suggest a greater degree of impairment than shown by the medical evidence alone.  He accordingly considered plaintiff's statements based on the seven factors set forth in SSR 96-7p.[16]  (Tr. at 18.)

---

[16]Those factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  (Tr. at 18.)  As indicated in note 15, supra, the current symptom evaluation regulation, SSR 16-3p, lists the same seven factors.

The ALJ noted that plaintiff reported a fairly wide range of daily activities, including household chores, some yard work, and the ability to drive and do some grocery shopping. While the ALJ did not suggest that plaintiff's activities were completely unlimited, he did describe performing several different types of chores regularly, which indicated that his impairments were not completely debilitating. (Tr. at 18.) Regarding the frequency and intensity of plaintiff's symptoms, the ALJ noted that plaintiff often reported that his pain was under control or stable, which suggested that the symptoms were not severe on a daily basis. The ALJ further noted that plaintiff's overall course of treatment had been conservative; he received pain management injections in 2012, but then declined a spinal cord stimulator and did not require more aggressive treatment in 2013 and beyond. Similarly, his right shoulder required no further interventions after the 2013 surgery. (Tr. at 18.) In terms of "other factors," the ALJ again referred to the June 3, 2014, VA progress note, in which plaintiff declined to increase his activity and exercise out of a concern that it would interfere with his upcoming SSI hearing. "This raises the logical question as to whether or not the claimant would indeed have increased his activities had this hearing not been coming up. Regrettably, the claimant's credibility is diminished by the presence of this statement in the record." (Tr. at 19.)

Turning to the opinion evidence, the ALJ noted a conflict between plaintiff's long-time treating physician, Dr. Baur, and the non-examining medical consultants. Although agency regulations favor treating sources, in this case the ALJ sided with the consultants. (Tr. at 19.)

Dr. Walcott, the initial agency consultant, reviewed the record in April 2013, concluding that plaintiff could sustain sedentary work. A second consultant, Dr. Torello, who reviewed the record in September 2013 at the reconsideration stage, concurred with Dr. Walcott. Dr. Baur, in an April 2013 report, opined that plaintiff only sit for a total of four hours, and stand/walk a

26

total of less than two hours, while needing to lie down for one to two hours, over an eight-hour workday. He further opined that plaintiff would be absent more than three times per month. In June 2014, Dr. Baur endorsed the April 2014 functional capacity evaluation, which found that plaintiff could only work a four hour day, standing up to 15 minutes at a time, sitting for 30 to 60 minutes, and lifting no more than 20 pounds occasionally. (Tr. at 19.)

The ALJ acknowledged the presumption in favor of treating physician opinions, which may in some circumstances receive controlling weight. (Tr. at 19-20.) However, that is appropriate only if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. The ALJ found that Dr. Baur's opinions were not entitled to controlling weight in this case. The April 2013 report was completed less than a year after the alleged disability onset date, shortly after plaintiff had received injections and was considering spinal cord stimulator implant surgery. The records from after April 2013 showed that plaintiff's pain came under better control. Further, the April 2014 FCE, which Dr. Baur later endorsed, came out just before plaintiff's June 2014 statement that he did not wish to increase his activities due to his upcoming SSI hearing. For these reasons, the ALJ declined to give Dr. Baur's opinions controlling or even great weight. He did consider the opinions in reducing plaintiff to a sedentary level of exertion but declined to accept that plaintiff could not sustain a full eight-hour workday. (Tr. at 20.)

The ALJ also considered the March 2015 vocational evaluation, which concluded that plaintiff did not have the skills for employment with his numerous restrictions and that it was uncertain if he could work full-time. The ALJ noted that this was not a medical report, and that the physical limitations upon which it was based came from plaintiff's self-report, not any objectively verifiable physical examination results. (Tr. at 20.) Since the ALJ discounted

27

plaintiff's allegations, the ALJ gave this report, which assumed their validity, little weight. (Tr. at 20-21.)

In sum, the ALJ found his RFC conclusion supported by the objective medical evidence, plaintiff's daily activities, and the opinions of Drs. Walcott and Torello. The ALJ found the consultants' opinions well supported by the evidence, but added additional manipulative limitations based on plaintiff's subsequent history of surgery and residual symptoms in his right arm. (Tr. at 21.)

At step four, the ALJ accepted the VE's identification of plaintiff's five past jobs: roofer, medium generally, heavy as performed; plate mounter, medium; overnight stocker, heavy; area manager, sedentary generally, medium as performed; and department manager, medium. (Tr. at 21.) In comparing plaintiff's RFC to the demands of these jobs, the ALJ found that plaintiff could perform the area manager job, as generally performed, i.e., at the sedentary level. He accordingly found plaintiff not disabled. (Tr. at 22.)

On December 1, 2016, the Appeals Council denied review (Tr. at 1), making the ALJ's decision the final word from the Commissioner on plaintiff's application. See Lanigan v. Berryhill, 865 F.3d 558, 563 (7th Cir. 2017). This action followed.

## II. DISCUSSION

### A.    June 3, 2014 VA Chart Note

Plaintiff argues that the ALJ gave too much weight to the June 3, 2014, VA chart note, in which plaintiff indicated, in response to a suggestion that he increase activity/exercise, that he did "not want to do any activities that will interfere" with his upcoming social security hearing. (Tr. at 17, quoting Tr. at 838.) The ALJ inferred from this statement that plaintiff had the ability

to do more but chose not to because he thought it would harm his chances of getting disability benefits; the ALJ relied on the note as a strike against plaintiff's credibility (Tr. at 19) and as a basis for discounting the April 2014 FCE, which concluded that, despite a good effort on testing, plaintiff could not sustain full-time work (Tr. at 20).

Plaintiff first contends that this is a hearsay statement, which he does not recall making. (Pl.'s Br. at 10.) As plaintiff acknowledges, however, the rules of evidence do not apply at social security hearings, 42 U.S.C. § 405(b)(1), and ALJs regularly rely on such contemporaneous statements to providers in evaluating the credibility of a claimant's description of his symptoms. See, e.g., Michalec v. Colvin, 629 Fed. Appx. 771, 775 (7th Cir. 2015); Heppell-Libsansky v. Comm'r of Soc. Sec., 170 Fed. Appx. 693, 699 (11th Cir. 2006); Mueller v. Astrue, 860 F. Supp. 2d 615, 635 (N.D. Ill. 2012). The ALJ gave plaintiff a chance to explain the statement at the hearing, and plaintiff said he did not recall the conversation. (Tr. at 48.) Plaintiff fails to explain why his lack of recall required the ALJ to disregard the statement. See Alvarado v. Colvin, 836 F.3d 744, 750 (7th Cir. 2016) (stating that "it is entirely permissible to examine all of the evidence" in determining whether the claimant's testimony about the effects of his impairments is credible or exaggerated).

Second, plaintiff argues that the note confirms his ongoing, chronic pain, which caused him to ask about a higher dosage of medication. (Pl.'s Br. at 10.) The ALJ set forth the context of the note (Tr. at 17), and he accepted that plaintiff's pain limited his ability to function (Tr. at 18). However, he reasonably relied on plaintiff's apparent reluctance to increase his activities as a reason for discounting his claim that the pain was completely debilitating. (Tr. at 18.) Importantly, and as will be discussed in more detail below, the ALJ did not rely solely on this note; he also considered the numerous statements in the treatment records that plaintiff's pain

29

came under control with a modified medication regimen, his overall conservative course of treatment, and his ability to perform a fairly wide range of daily activities. (Tr. at 18.)

Third, plaintiff contends that if he really had been malingering that should have been mentioned elsewhere in the record. (Pl.'s Br. at 10.) He specifically notes that the April 2014 FCE report said he gave good effort, and that Dr. Baur likewise found that plaintiff had been reliable. (Pl.'s Br. at 10-11.) This is essentially an argument that the ALJ gave the June 2014 statement too much weight in light of the other evidence; it is the ALJ's job to weigh the evidence, resolve conflicts, and make independent findings of fact, not the court's. E.g., Butera v. Apfel, 173 F.3d 1049, 1055 (7th Cir. 1999).

Fourth, plaintiff argues that the June 2014 note does not specify the "activities" that might interfere with his social security claim; absent some indication that those activities would be coincident with full-time work, he contends that the ALJ's reliance on the note amounts to mere speculation. (Pl.'s Br. at 10-11.) The credibility of plaintiff's claim that his pain precluded full-time work, at even the sedentary level, was central to this case; it was not unreasonable for the ALJ to cite this note, which suggested that plaintiff was capable of more than he claimed, as one part of his analysis.[17]

Finally, plaintiff contends that, contrary to the suggestion in the June 3, 2014 note that his hearing was "coming up soon" (Tr. at 838), the notice of hearing was not sent out until June 11, 2015, a year later (Tr. at 151). (Pl.'s Br. at 11-12.) However, plaintiff requested a hearing before an ALJ in October 2013 (Tr. at 138), and that request was pending at the time he made the statement to the VA provider. Nothing about the timing of the administrative proceedings

---

[17]The ALJ discussed plaintiff's actual daily activities as part of the credibility analysis.

makes the June 2014 note unreliable.

**B.    DOT Code**

Plaintiff next challenges the ALJ's denial of the claim at step four based on the VE's testimony that plaintiff could return to his past work as an "area manager," DOT code 183.118-010, a sedentary job as generally performed.  (Tr. at 21-22, 67.)  Plaintiff argues that the VE selected the wrong code from the more than 200 "manager" jobs in the DOT.  Rather than relying on # 183.118-010, entitled "manager, branch (any industry)", he contends that the VE should have used # 185.167-046, entitled "manager, retail store," which more closely aligns with his duties at Walmart but which is performed at the light level.  (Pl.'s Br. at 12-15.)

While plaintiff disagrees with the DOT code the VE selected, he makes no claim that her testimony conflicted with the DOT.  Cf. Prochaska v. Barnhart, 454 F.3d 731, 735-36 (7th Cir. 2006).  Nor does he provide any authority for the court to now second guess her classification of this past job.  Plaintiff had the opportunity to question the VE on this issue at the hearing, but he failed to do so.  Under these circumstances, the ALJ was allowed to rely on the VE's uncontradicted testimony.  See Brown v. Colvin, 845 F.3d 247, 254 (7th Cir. 2016) ("Brown . . . forfeited her argument regarding the vocational expert's testimony about the number of positions for each of the six jobs by failing to object during the hearing."); Barrett v. Barnhart, 355 F.3d 1065, 1067 (7th Cir. 2004) ("However, because Barrett's lawyer did not question the basis for the vocational expert's testimony, purely conclusional though that testimony was, any objection to it is forfeited."); Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002) ("When no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the

vocational expert's conclusion[.]").[18]

## C.    Treating Source Opinions

Plaintiff further contends that the ALJ erred in discounting Dr. Baur's opinions.  (Pl.'s Br. at 15.)  While a treating physician's opinion is important, it is not the final word on a claimant's disability.  Schmidt v. Astrue, 496 F.3d 833, 842 (7th Cir. 2007).  The ALJ may discount a treating physician's medical opinion if it conflicts with the provider's own treatment notes, is inconsistent with the opinion of a consulting physician, or is based on the claimant's subjective complaints, see, e.g., Loveless v. Colvin, 810 F.3d 502, 507 (7th Cir. 2016); Ketelboeter v. Astrue, 550 F.3d 620, 625 (7th Cir. 2008), so long as he minimally articulates his rationale, Schmidt, 496 F.3d at 842.

The ALJ satisfied that standard here.  He acknowledged the preference for treating sources, but he declined to give Dr. Baur's opinions controlling or even great weight.  In April 2013, Dr. Baur opined that plaintiff could not, due to pain, sustain a regular, full-time work schedule.  The ALJ noted that Dr. Baur prepared this report less than one year after the alleged onset of disability, and at a time when plaintiff's condition seemed more precarious: he had recently received injections for his groin pain, his pain management provider had recommended a spinal cord stimulator, and he was about to undergo shoulder surgery.  But as the ALJ further noted, plaintiff's pain thereafter came under better control through a modified medication regimen, plaintiff declined to pursue the spinal cord stimulator, and he appeared

---

[18]In her response brief, the Commissioner noted that plaintiff forfeited his DOT argument by failing to raise it at the hearing.  Plaintiff has filed no reply addressing the Commissioner's contention. He does not, for instance, argue that the discrepancy between the VE's testimony and the DOT was so obvious the ALJ should have picked up on it on his own. See Overman v. Astrue, 546 F.3d 456, 463 (7th Cir. 2008).

to recover well after the shoulder surgery with few additional mentions of that condition in the medical records. (Tr. at 19-20.)

Substantial evidence, cited by the ALJ, supports this conclusion. In late 2012, Dr. Baur switched plaintiff from Oxycodone to morphine, and by early 2013 plaintiff started reporting "reasonable pain control overall." (Tr. at 16, 509.) They started spacing out plaintiff's office visits based on his compliance with the new regimen, and by June 2013 plaintiff reported that "overall things are going well." (Tr. at 16, 570.) Around that time, plaintiff switched his primary care to the VA, although he continued to see Dr. Baur on occasion. In June 2014, plaintiff told Dr. Baur his pain control was satisfactory, in November 2014 that overall things were going well, and in March 2015 that things were unchanged. (Tr. at 16-17, 789, 793, 800.) A May 2015 VA noted indicated that plaintiff's pain was "controlled on current . . . regimen." (Tr. at 17, 836.)

The ALJ also considered Dr. Baur's June 2014 treatment note endorsing the April 2014 FCE, which concluded that plaintiff could not sustain full-time work. As the ALJ noted, plaintiff completed the FCE shortly before making the statement to the VA provider that he did not want to increase his activities because it might diminish his chances of getting disability benefits. (Tr. at 20.) It was not unreasonable for the ALJ to doubt the validity of the FCE given plaintiff's apparent admission that he was holding back on activities and exertion so as not to diminish his chances of obtaining benefits. The ALJ instead credited the opinions of the agency medical consultants, Drs. Walcott and Torello, finding their conclusion that plaintiff could sustain full-time sedentary work supported by the evidence of record, although the ALJ added manipulative limitations based on plaintiff's subsequent surgery and residual right shoulder symptoms. (Tr. at 21.)

33

In his brief, plaintiff details the extensive treatment he received for groin pain prior to the alleged onset date; the difficulties his providers had in bringing his pain under control in 2012; and his continued complaints of pain from 2013-15. (Pl.'s Br. at 17-20.) The ALJ discussed this evidence (Tr. at 16-17), and plaintiff does not claim otherwise.[19] Plaintiff does contest the ALJ's conclusion that his pain came under better control, noting Dr. Baur's June 2014 assessment that he is "clinically stable, but remains symptomatic." (Tr. at 791.) The ALJ specifically discussed this note, acknowledging that plaintiff continued to experience flare-ups of pain, but concluded that "later notes from Dr. Baur do not show such a high degree of pain." (Tr. at 17.) A reasonable mind could, in light of the evidence cited above, agree with the ALJ's assessment of the record. See Powers v. Apfel, 207 F.3d 431, 434-35 (7th Cir. 2000) ("Because the Commissioner is responsible for weighing the evidence, resolving conflicts and making independent findings of fact, this Court may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the Commissioner to decide whether a claimant is or is not disabled.") (internal citation omitted). That a reasonable person could perhaps draw a different conclusion is not a basis for reversal. See Herr v. Sullivan, 912 F.2d 178, 181 n.4 (7th Cir. 1990).

Plaintiff also faults the ALJ for failing to note that he displayed pain on palpation during almost every physical exam. (Pl.'s Br. at 20-21.) But an ALJ is not required to discuss every piece of evidence in the record; he is precluded only from ignoring an entire line of evidence contrary to his conclusion. Jones v. Astrue, 623 F.3d 1155, 1162 (7th Cir. 2010). The ALJ

---

[19]Plaintiff contends that the ALJ overlooked Dr. Baur's opinion that he would be absent from work four or more days per month (Pl.'s Br. at 16), but that is incorrect (see Tr. at 20, noting this aspect of the report.)

acknowledged that plaintiff had "long-term chronic groin pain" (Tr. at 18) but reasonably concluded that this pain was not completely debilitating.[20]

## D.    Symptom Evaluation

Finally, plaintiff argues that the ALJ erred in evaluating his symptoms under SSR 16-3p. (Pl.'s Br. at 21-23.)  As discussed in note 15 above, in 2016, after the ALJ issued his decision in this case, the Commissioner revised her Ruling on symptom evaluation.  Although the new Ruling eliminates use of the term "credibility," it uses the same two-step test and directs consideration of the same seven factors the ALJ noted in his decision.[21]

Plaintiff first notes that, under SSR 16-3p, ALJs are supposed to check the consistency of the claimant's reported symptoms with the medical evidence; he contends that he consistently reported pain, which limited his ability perform work-related activities.  (Pl.'s Br. at 23.)  As discussed above, the ALJ thoroughly reviewed the medical evidence, reasonably concluding that, although plaintiff continued to experience symptoms, his pain came under satisfactory control in 2013.  As also discussed above, the ALJ found plaintiff's claims inconsistent with his June 2014 comment to the VA provider.[22]

Second, plaintiff argues that the ALJ relied on his reported daily activities without considering his limitations in performing those tasks.  (Pl.'s Br. at 24.)  That is incorrect.  The

---

[20]Plaintiff mentions, but develops no argument that the ALJ erred in considering, the March 2015 vocational evaluation.  (Pl.'s Br. at 16.) As the ALJ noted, this report was explicitly based on plaintiff's "self-reported restrictions."  (Tr. at 277.)  Because he did not fully accept plaintiff's statements, the ALJ declined to credit this report.  (Tr. at 20-21.)

[21]There is accordingly no need to consider whether SSR 16-3p applies "retroactively" to review of a 2015 ALJ decision.

[22]Consistent with SSR 16-3p, the ALJ focused on plaintiff's symptoms and limitations, rather than assessing his character.

ALJ specifically noted plaintiff's testimony that he drove less than he used to, that he purchased "light" groceries, that he "help[ed]" with the laundry, and that he did "some" yard work.[23]  (Tr. at 15.)  Further, after listing plaintiff's activities, the ALJ stated: "I certainly do not mean to suggest that his daily activities are completely unlimited, but he does describe performing several different types chores regularly, which indicates that his impairments likely are not completely debilitating."  (Tr. at 18.)   Importantly, the ALJ did not totally discount plaintiff's testimony regarding how his pain affected his ability to perform certain activities, "as evinced by the ALJ's decision to limit [plaintiff's] range of work to sedentary when assessing [his] residual functional capacity."  Schmidt, 496 F.3d at 844.

Plaintiff also cites the Seventh Circuit's case-law chiding ALJs for equating minimal tasks with the ability to work full-time (Pl.'s Br. at 25), but the ALJ made no such comparison here.  Rather, he found that plaintiff's ability to engage in a variety of activities, including household chores, some yard work, and some grocery shopping, undercut his allegation of daily, debilitating pain.  As the Commissioner puts it, there is a critical difference between an ALJ improperly saying, the claimant can perform this range of activities, therefore he can work, see Roddy v. Astrue, 705 F.3d 631, 639 (7th Cir. 2013), and an ALJ reasonably saying that the claimant can perform this range of activities, therefore he can do more than he claims, see Pepper v. Colvin, 712 F.3d 351, 369 (7th Cir. 2013).  (Def.'s Br. at 10.)

Even if the ALJ should have said more about how plaintiff's activities undercut his claims, I cannot conclude that his ultimate determination was "patently wrong."  Schloesser v.

---

[23]Plaintiff complains that the ALJ did not specifically discuss the limitations noted in his written disability reports (Pl.'s Br. at 24-25), but the ALJ is not required to discuss every piece of evidence in the record.  See Jones, 623 F.3d at 1162.

Berryhill, 870 F.3d 712, 717 (7th Cir. 2017).  As discussed, the ALJ considered all of the factors set forth in the regulations, including plaintiff's conservative course of treatment, with his groin pain brought under reasonable control with medication, <u>see</u> <u>Skinner v. Astrue</u>, 478 F.3d 836, 845 (7th Cir. 2007) (affirming where the medical evidence established that symptoms were largely controlled with proper medication), and his shoulder requiring little or no treatment after the surgery; the frequency and intensity of his symptoms, including the manner in which he described those symptoms to his providers; and "other factors," including his June 2014 statement to the VA provider about his upcoming hearing.  (Tr. at 18-19.)  <u>See</u> <u>Halsell v. Astrue</u>, 357 Fed. Appx. 717, 722 (7th Cir. 2009) ("Not all of the ALJ's reasons must be valid as long as <u>enough</u> of them are[.]").

## III.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is affirmed, and this case is dismissed.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 15th day of November, 2017.

/s Lynn Adelman
LYNN ADELMAN
District Judge